IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FRANKLIN JAVIER MEDINA,            *

    Petitioner,            *

       v.            *            Civil Action No. DKC-18-1037

WARDEN JEFF NINES and            *
THE ATTORNEY GENERAL OF THE
STATE OF MARYLAND,            *

    Respondents.            *
                ***

## MEMORANDUM OPINION

Petitioner Franklin Javier Medina, who is represented by counsel, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on April 10, 2018.  ECF No. 1.  The Petition, which was amended on September 17, 2018, challenges Mr. Medina's 2013 conviction in the Circuit Court for Baltimore County, Maryland for attempted first- and second-degree rape and first- and second-degree assault.  ECF No. 10.  Mr. Medina alleges violations of his Fourteenth Amendment right to due process, citing *Brady v. Maryland*, 373 U.S. 83 (1963), and Sixth Amendment right to effective assistance of counsel, citing *Strickland v. Washington*, 466 U.S. 668 (1984).  *Id.*  Respondents filed an Answer asserting that Mr. Medina's claims do not merit federal habeas relief under the applicable standards.  ECF No. 17.  Mr. Medina filed a reply disputing Respondents' assertion.  ECF No. 20.

The court finds no need for an evidentiary hearing.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2016); *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)).  For the reasons that follow, Mr. Medina's Petition is denied and a certificate of appealability will not issue.

## BACKGROUND

As recounted by the Court of Special Appeals on Mr. Medina's direct appeal from the judgment of conviction, the prosecution's evidence at trial established that:

On August 6, 2006, the complainant in this case, M.C., was then employed as a manager at a massage center on York Road in Baltimore County. At Appellant's trial, M.C. testified that although she was licensed as a massage therapist, her primary responsibilities at the time were as a cook, custodian, greeter, and manager, while three other women who worked there conducted the massages.

M.C. spent each night at the business and was in her first floor bedroom at the time of the incident in question. It was after 3:00 a.m., and M.C. had retired for the night. She awoke when she "felt like somebody was staring at [her.]" M.C. [whose testimony was partially received through a translator] continued:

So, I just cracked open my eyes. Then a man suddenly asked me, "Do you want to f[..]k?" So I just instantly answered, "No."
* * *
After then he put his knees here and pressing here and pressed my neck with his both hands, then bit my face here [on the cheek]. Then I felt in just a very short moment, I pray to God thinking I'm gonna die now.

M.C. testified that she passed out and was in a state of unconsciousness for several hours. She denied any consensual contact. After she awoke, M.C. went across the street to a gas station and called the police. When asked whether she could see her assailant, M.C. responded: "As [far] as I can remember, even though I cannot [sic] clearly saw [sic] him, he was medium height, little long hair, and a little chubby."

Officer Brian Goetz responded to the call and met M.C. at the gas station. He recalled that M.C. appeared to be confused and incoherent. He testified that M.C. "appeared to be badly beaten. She was bleeding from her nose, her eyes, and her mouth. Her face was very swollen and black and blue. It also appeared as though she had red marks around her neck on each side." When Officer Goetz spoke with M.C. at the hospital, M.C. appeared to be "unsure about a lot," but could nevertheless recall that the assailant wore a white T-shirt and that he "could have been [w]hite." Officer Zachary Slenker testified that, during the investigation in the immediate aftermath of the assault, police recovered M.C.'s wallet next to a dumpster of a nearby supermarket. Near the same shopping center, police found a white T-shirt lying close to the sidewalk.

Detective Dan Kuhns with the Special Victims Unit of the Baltimore County Police Department testified that he met with M.C. at Sinai Hospital. According to the detective,

> [M.C.'s] face was extremely swollen. She had bruising around her neck, she had bruising on her face, and she had what appeared to be a bruise consistent with a bite mark on the left side of her face near her eye. Her eyes were swollen shut, and there was a cut near her right eye as well.

Ms. Linda Kelly, a SAFE [Sexual Assault Forensic Examination] nurse, examined M.C. Ms. Kelly testified that, as part of the assessment, she photographed M.C.'s injuries, and then collected swabs of the injured places on her body. She identified two vaginal tears. Ms. Laura Pawlowski testified to the serological and DNA tests performed by Ms. Jodine Zane on the fluid samples collected by Ms. Kelly. Tests on vaginal and cervical swabs gave negative results for blood and semen. However, tests on the facial bite mark swab indicated the presence of blood and saliva. DNA profiles were obtained from the bite mark swab, which indicated the presence of more than one individual's DNA in the sample. These DNA testing results were entered into the CODIS [Combined DNA Index System] database on December 21, 2006.

Detective Kuhns testified that in the months following the assault, the police considered several suspects who had been implicated because of their respective roles in unrelated police investigations. Appellant was not, at the time, considered a suspect. A comparison of the suspects' DNA samples with the DNA sample obtained from the bite mark on M.C.'s cheek did not produce a match. With their leads exhausted, the Baltimore County police put the investigation on hold. No further progress was made for five years.

A break came in August 2011, when Detective Kuhns was notified that a male DNA profile recently entered into CODIS matched the DNA profile from the bite mark licking swab taken from M.C. in 2006. The matching DNA profile belonged to Appellant. Detective Kuhns then applied for a statement of charges and an arrest warrant on August 10, 2011 for Appellant for the rape and robbery of M.C., and police arrested Appellant the same day. Detective Kuhns also obtained search and seizure warrants on September 26, 2011 and August 13, 2012 to collect additional DNA samples from Appellant in the form of buccal swabs. The purpose of these additional swabs was to compare his saliva and DNA taken directly from Appellant's mouth and to confirm that he was the contributor of the DNA that was found in the bite mark that M.C. received in 2006.

Ms. Pawlowski described the DNA comparison process that implicated Appellant in the 2006 assault. Appellant's DNA could not be excluded as the source of saliva present in the bite mark swab, although 99.9% of the African-

3

American, Caucasian, Southwest Hispanic, and Southeast Hispanic populations could be excluded. Ms. Pawlowski explained her testing and its results:

> [PROSECUTOR:] When you compared the bite mark licking swabs from the cheek of [M.C.] with the buccal swabs from [Appellant] . . . what were the conclusions of your examination?
>
> [MS. PAWLOWSKI:] For . . . the bite mark licking swab, I compared my swab to the mixture that Ms. Jodi[n]e Zane had originally detected in her analysis. My conclusion was that neither [M.C.] or [Appellant] could be excluded from the mixture of DNA that she had in that sample. I further said that if there were only two people present in that mixture, it is consistent with being a mixture of [M.C.] and [Appellant].
>
> Making that statement means that I looked at that mixture, I felt it was a two person mixture. Looking across the profiles from [M.C.] and [Appellant], every allele is accounted for in that mixture. There are no extra alleles, there's nothing that is missing. I then went on and did a statistical analysis of that profile.
>
> * * *
>
> If there are only two people present in that mixture, it's consistent with being a mixture of the DNA profile of [M.C.] and Mr. Medina.

Detective Kuhns testified that an investigation revealed that in 2006 Appellant resided on Cranbrook Road, approximately 1.1 miles from the crime scene. The State introduced transcripts of jailhouse telephone conversations between Appellant and his mother and girlfriend. Appellant told them that the house was a massage place, and intimated that the goings on there were for more than a massage. He disclosed that he had been to the massage center around the time of the assault in 2006 but was not there on the day of the assault. He avowed that he had not entered the business without permission.

After a four-day trial and four hours of deliberation, on July 19, 2013, the jury found Appellant guilty of first- and second-degree assault and of attempted first- and second-degree rape. Appellant was acquitted of first- and second-degree rape, as well as first-degree burglary and robbery. On September 18, 2013, the trial court imposed a sentence of life imprisonment and required him to register as a Tier III sex offender.

*Medina v. State*, No. 13-1510, Sept. Term 2013 (Md. Ct. Spec. App. June 8, 2015); ECF No. 10-19 at 2-8 (footnotes omitted). During sentencing, the trial court also denied Mr. Medina's motion

for a new trial, which had been filed in July 2013.  Sentencing Transcript, ECF No. 10-17 at 2;

Mot. For New Trial, ECF No. 10-20 at 88-102.

Mr. Medina timely appealed to the Court of Special Appeals of Maryland, raising the single

claim that the trial court erred in limiting the cross-examination of M.C.  *See* ECF No. 10-19 at 2.

On June 8, 2015, the Court of Special Appeals affirmed Mr. Medina's convictions.  *Id.* at 29.  Mr.

Medina sought further review in the Court of Appeals of Maryland, but his petition for writ of

certiorari was denied by Order dated September 21, 2015.  Pet., ECF No. 10-19 at 30-19; *Medina*

*v. State*, Pet. Docket No. 265, Sept. Term., 2015 (Md. Ct. App. Sept. 21, 2015), ECF No. 10-19 at

40.  Mr. Medina did not seek review in the United States Supreme Court.  *See* ECF No. 10-1 at 7.

On September 19, 2016, Mr. Medina filed a petition for post-conviction relief in the Circuit

Court for Baltimore County.  SR 41-89.  On April 17, 2017, he supplemented the petition to include

the following claims:

1.  Trial counsel's representation was constitutionally ineffective in failing to present evidence that would have connected a black male in a white T-shirt to the location where the Victim's personal property was recovered.

2.  Trial counsel's representation was constitutionally ineffective for failing to strike a juror who knew the primary officer.

3.  Trial counsel committed a serious attorney error that prejudiced Mr. Medina in failing to object to inadmissible hearsay statements from Officer Goetz regarding statements made by the victim at the hospital.

4.  That either (a) the State violated its duty under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose exculpatory evidence, or (b) Trial Counsel performed deficiently under *Strickland v. Washington*, 466 U.S. 668 (1984), by failing to investigate and discover evidence that: (i) three of the victim's co-workers present at the time of the offense were interviewed and one described a possible suspect as a young, black male, which contradicted the victim's description and was inconsistent with Medina's appearance; (ii) a homeless man sleeping near the crime scene observed a black male wearing a white T-shirt running toward the location where the property was found; (iii) the victim had been entertaining an unknown number of men on the night of the assault; (iv) the victim contacted police on September 21, 2006,

5

to report that she believed her attacker was "Joe," an older white man who was paid her at the request of her employer; and (v) that on September 22, 2006, the victim asked that police investigate Joe so as not to bring attention to her from her boss, as he was involved in organized crime and she feared for her safety were he to find out she was cooperating with police.

5.    The cumulative effect of the preceding assignments of error entitles Mr. Medina to post-conviction relief.

Pet. for Post-Conviction, ECF No. 10-19 at 41-89; Am. Pet., ECF No. 10-20 at 105-224. Following a hearing on June 28, 2017, the post-conviction court denied Mr. Medina's petition by Memorandum Opinion and Order dated August 17, 2017. Post-Conviction Transcript, ECF No. 10-18; *Medina v. State*, Case No. K-11-004873 (Cir. Ct. Balt. Cnty. Aug. 17, 2017), ECF No. 10-21 at 268-80.

On September 18, 2017, Mr. Medina sought leave to appeal from the denial of post-conviction relief, raising the following questions in his application:

1.    Whether the post-conviction court erred when it failed to address each ground raised by Mr. Medina.

2.    Whether the post-conviction court erred in how it applied the *Strickland* standard to the inadmissible hearsay testimony of Officer Goetz that provided key support for the attempted rape convictions.

3.    Whether the post-conviction court erred in its ruling on Mr. Medina's *Brady* claims, by failing to articulate the legal basis for its decision, finding facts that were not supported by the record, and in its conclusion that there was no prejudice.

4.    Whether the post-conviction court's factual findings were clearly erroneous.

5.    Whether the post-conviction court abused its discretion in finding that no evidence was presented regarding prejudice and erred in applying well settled principles of law to the facts of this case.

Application for Leave to Appeal, ECF No. 10-21 at 281-349. In an unreported per curiam decision, the Court of Special Appeals summarily denied Mr. Medina's request on April 3, 2018, with the

mandate issuing on May 3, 2018.  *Medina v. State*, No. 1544, Sept. Term 2017 (Md. Ct. Spec. App. April 3, 2018), ECF No. 10-22 at 31-33.

## CLAIMS FOR RELIEF

By his Amended Petition for writ of habeas corpus filed in this court, Mr. Medina claims that he is being detained in state custody illegally.[1]  First, Mr. Medina alleges that the suppression of material exculpatory evidence violated his right to due process pursuant to *Brady*.  ECF No. 10-1 at 14-24.  Specifically, he claims that the prosecutor suppressed four police reports that would have impeached the victim's credibility or supported the defense that someone else committed the crimes.  *Id.* at 14-18.  Mr. Medina also asserts that the prosecutor violated *Brady* in failing to reissue, or disclose a second time, its previous discovery when asked to do so by the defense a month after the original issuance.  *Id.* at 23-24.

Second, Mr. Medina claims that trial counsel rendered ineffective assistance pursuant to *Strickland* because his "undisputed lack of knowledge regarding exculpatory evidence and his non-strategic failure to object to inadmissible hearsay led to [the] conviction."  ECF No. 10-1 at 9-18, 24-29.  In support of this assertion, Mr. Medina avers that if the prosecutor did comply with *Brady* with regard to the four police reports, defense counsel was constitutionally ineffective for failing to be aware of, and introduce, those reports at trial.  *Id.* at 24-27.  Mr. Medina also claims that defense counsel was ineffective for failing to object to a hearsay statement of the victim, relayed by an officer at trial, describing certain circumstances of the sexual assault.  *Id.* 28-29.

---

[1] According to the Department of Public Safety & Correctional Services, Mr. Medina is presently confined at North Branch Correctional Institution, where the current warden is Jeff Nines.  Therefore, the Clerk will be directed to amend the docket to name the proper Respondent. *See Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (stating that "in habeas challenges to present physical confinement . . . the proper respondent is the warden of the facility where the prisoner is being held").

## STANDARD OF REVIEW

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  The federal habeas statute at 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("Act"), sets forth a "highly deferential standard for evaluating state-court rulings."  *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447, 455 (2005).  In order to obtain relief on his claims, the petitioner must show that the adjudication of such claims at the state court level:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The Act further provides that:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

§ 2254(e)(1).

A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]."  *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (citation omitted).  Under the "unreasonable application" analysis under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541

U.S. 652, 664 (2004)).   Thus, "an unreasonable application of federal law is different from an incorrect application of federal law."   *Id*. (emphasis and citation omitted).

## DISCUSSION

### I.   *Brady* Claims

Mr. Medina claims that the State violated his due process rights, pursuant to *Brady*, when it failed to include 755 pages of the 821-page set of discovery materials during its initial disclosure, and again when it declined to reissue, upon request, the previously disclosed discovery a month after the original issuance.   According to Mr. Medina, he was prejudiced by the suppression of the evidence, as the missing pages contained information that would have bolstered his theory of defense and cast doubt on the State's case.   Specifically, he cites to:

1)   Officer Slenker's August 6, 2006 report that included a witness statement from a local homeless man who recalled seeing a black man wearing a white shirt running through the woods on the morning of the incident.   Medina states that this information was consistent with the white shirt found in the vicinity as well as the statement of one of the women in the massage center who recalled seeing a black man with a white shirt running from the victim's room.

2)   Det. Kuhns's August 21, 2006 report indicating that M.C. initially stated that she had "some company" until 1 a.m., and a guest named Peter who left at 3 a.m.   Medina claims that this information would have been useful in impeaching M.C.'s efforts to disclaim involvement in prostitution activities.

3)   Det. Kuhns's August 26, 2011 report noting a negative photo identification of Medina by the victim.

4)   Det. Kuhns's and Det. Burrows's reports dated September 21 and 22, 2006, indicating that the victim believed someone else named Joe committed the crime and suggested that her boss may kill her for cooperating with authorities.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment."   *Brady*, 373 U.S. at 87.   "The *Brady* rule is based on the requirement of due process.   Its purpose is not to

displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *United States v. Bagley*, 473 U.S. 667, 675 (1985).  To prevail on a *Brady* claim, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  There is no requirement that the guilty finding must be overturned unless suppression of the impeachment evidence so limited the defense's ability to cross-examine an accusing witness that "its suppression undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678.

From the record, it appears that prior to trial, Mr. Medina was originally represented by attorney Gary Maslan.  *See* Am. Pet., ECF No. 10 at 11.  During Mr. Maslan's representation of Mr. Medina, he received an initial discovery package that included:  (1) a cover letter from then Assistant State's Attorney Keith Pion to Maslan dated October 17, 2011; (2) an itemized inventory of 295 documents contained on the second of seven compact discs; and (3) copies of the seven discs.  *See* Post-Conviction Transcript, ECF No. 10-18 at 134-35, 191-95; ECF No. 10-21 at 14-30.  Less than a month after the initial disclosure, attorneys Samuel Delgado and David Wooten replaced Mr. Maslan as defense counsel for Mr. Medina.  *See* ECF No. 10 at 11; ECF No. 10-18 at 198.  They asked the State to reissue its October 17, 2011 discovery, which the prosecutor denied after construing it as a request for continuing discovery, believing that Mr. Maslan was also still representing Mr. Medina.  ECF No. 10-18 at 198-99.  In any event, Mr. Delgado acknowledges having received from Mr. Maslan the seven discs, to which the detailed inventory was "presumably" attached.  ECF No. 10-18 at 135-43.  Following a post-trial request under Maryland's Public Information Act, however, Mr. Medina claims that the discs received by

defense counsel contained only 66 pages of documentary evidence and did not include six file folders containing 755 pages. *See* ECF No. 10-1 at 22-23.

During the post-conviction proceeding in state court, Mr. Medina argued that the State committed a *Brady* violation by failing to provide defense counsel with the required discovery materials. *See* ECF No. 10-21 at 54. He did not, however, produce the original compact disks at the hearing. Thereafter, the post-conviction court rejected Mr. Medina's argument, finding:

> Mr. Maslan testified that he turned over to DelGado all of the discovery that his office had received from the State in this matter.
>
> Mr. DelGado retained attorney David Wooten to assist him in preparing the case for trial. DelGado and Wooten visited Maslan's office to discuss the case and retrieve all discovery that had been provided by the State up to that point in time. In addition to DNA testing results, counsel received evidence of telephone calls of Petitioner's conversations from the Baltimore County Detention Center that had been recorded. DelGado and Wooten also received nine discs containing additional documents provided by the State. DelGado, Wooten and a law clerk reviewed the material received from Maslan as well as subsequent discovery provided by the State.
>
> Evidence produced at the hearing in this matter revealed that the State, either directly to DelGado or Maslan, provided discs that included more than 800 pages of documents. Defense counsel and the Assistant State's Attorney communicated regularly, and at no time prior to trial did defense counsel indicate that he had not received an item in discovery. When, at trial, counsel claimed to have not received reports from two of the police officers, the reports were immediately provided and counsel was given as much time as he needed to review them before cross examining the witness.
>
> The Court is persuaded that defense counsel actually received all of the discovery whether or not he actually reviewed it all himself prior to trial. Even if there had been an inadvertent failure to provide some of the documents generated, no prejudice has been demonstrated that would warrant relief.

*Id.* at 54-55.

The post-conviction court's adjudication of Mr. Medina's *Brady* claims was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, nor was it based on an unreasonable application of clearly established Federal law as

determined by the Supreme Court.  As previously stated, to prevail on a *Brady* claim, the petitioner must, at a minimum, establish that evidence was "suppressed by the State."  *Strickler*, 527 U.S. at 281-82.  Here, the evidence presented at the post-conviction proceeding reflected that, in its initial disclosure, the prosecutor gave defense counsel seven compact discs, an itemized inventory of 295 documents contained on the disks, and a cover letter stating that the documents listed in the detailed inventory have been scanned to the disks.  *See* ECF No. 10-18 at 135.  Mr. Medina argued that the disks did not include over 700 pages of documents; however, he did not present any evidence – such as the disks he received – to support his assertion.  Moreover, as the post-conviction court notes, "at no time prior to trial did defense counsel indicate that he had not received an item in discovery," despite having received the detailed inventory.  "[A] *Brady* violation has not occurred if the defense is aware, or should have been aware, of impeachment evidence in time to use it in a reasonable and effective manner at trial."  *United States v. Parker*, 790 F.3d 550, 562 (4th Cir. 2015) (citing *United States v. Jeffers*, 570 F.3d 557, 573 (4th Cir. 2009)); *accord United States v. Wilson*, 901 F.2d 378, 381 (4th Cir.1990).  Thus, the post-conviction court's determination of the facts was not unreasonable.

In any event, as explained below, this court agrees that "even if there had been an inadvertent failure to provide some of the documents generated, no prejudice has been demonstrated that would warrant relief."[2]  ECF No. 10-21 at 55.  Thus, even assuming that the State had a duty to reissue the initial disclosure pursuant to defense counsel's request, Mr. Medina cannot prevail on his *Brady* claim because no prejudice ensued.  *See Strickler*, 527 U.S. at 281-82.

---

[2] The post-conviction court analyzed prejudice within the context of Medina's ineffective assistance claim, and this court shall do the same.

## II.      Ineffective Assistance Claims

Mr. Medina claims that his trial counsel, Mr. Delgado, rendered ineffective assistance because he lacked knowledge regarding exculpatory evidence found within the aforementioned police reports and he failed to object to a hearsay statement of the victim, relayed by an officer at trial, describing certain circumstances of the alleged assault.

When a petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687.  Representation is deficient if it falls below "an objective standard of reasonableness." *Id.* at 688.  To satisfy this first prong, it must be demonstrated that counsel's performance was not "within the range of competence normally demanded of attorneys in criminal cases." *Id.* at 687 (citations omitted).  The standard for assessing such competence is "highly deferential" and has a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id*. at 669.  A federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance.  A defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689).  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

A showing of prejudice requires that 1) counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable, and 2) there was a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland,* 466 U.S. at 690-94. "The benchmark of an ineffective assistance claim must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Id*. at 686. A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Id*. at 696. Thus, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

In its Statement of Reasons and Order, the post-conviction court addressed Mr. Medina's ineffective assistance claims, stating in pertinent part:

> Petitioner complains that trial counsel was ineffective for failing to elicit from the officer that another man who had been sleeping behind the dumpsters saw a black male wearing a white t-shirt run by him, discard the shirt, and run toward nearby apartments. The Court disagrees. It was not necessary for counsel to elicit that information since the DNA analysis was presented to the jury, including a determination that the DNA extracted from the semen on the shirt was not that of Petitioner. Thus, counsel did not err in failing to call an additional witness or to question Officer Slenker in this regard since the pertinent information was already before the jury and was uncontroverted. Even if counsel's performance had been deficient in this regard, there was absolutely no prejudice since the DNA analysis was presented to the jury.
>
> * * *
>
> Relying upon the ruling in *Muhammad v. State*, 223 Md. App. 255 (2015), Petitioner asserts that trial counsel in the present case was ineffective for failing to object to inadmissible hearsay in the testimony of Officer Goetz regarding statements made by the victim at the hospital. . . .
>
> In the present case, the statement about which Officer Goetz testified occurred shortly after the assault when the officer responded to the hospital to determine whether the victim could identify the suspect. She indicated that the attacker could have been white, had shoulder length hair and was wearing a white t-shirt. Trial counsel testified at the post conviction hearing that he was ineffective

14

for failing to object to that testimony. The record reveals, however, that counsel made use of the information to support his defense that someone other than the Petitioner committed the offense.

. . . In the present case, trial counsel was able to use much of Officer Goetz's testimony regarding the victim's statement to bolster his argument that Petitioner was not the man who assaulted her. This is particularly true since she described the attacker as wearing a white t-shirt, and a white t-shirt containing semen that did not match that of Petitioner was found near the scene where it had been discarded by a man running. Thus, notwithstanding trial counsel's current opinion that he should have objected to the testimony in this regard, the Court is not persuaded that he was ineffective in allowing it.

Moreover, had counsel been ineffective in this regard, the prejudice prong of Strickland has not been satisfied here. In order to show that counsel's deficient performance prejudiced the defense, Petitioner must show that the "errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Coleman v. State*, 434 Md. 320, 331 (2013), quoting *Strickland*, 466 U.S. at 687. The DNA match that came from the bite mark on the victim's face, combined with all of the rest of the evidence presented by the State was more than sufficient to render the result in this case reliable.

\* \* \*

Petitioner asserts that counsel was ineffective for failing to present evidence that on September 21, 2006, the victim reported seeing someone who physically resembled the perpetrator, and that on September 22, 2006, the victim advised that she had knowledge of an ongoing criminal enterprise. Assuming arguendo, that both statements would have been admissible, neither one contains probative information that would come close to rendering counsel's performance ineffective for failing to offer it. Moreover, even if the content of the statements was relevant and counsel was ineffective for failing to offer the evidence, Petitioner has utterly failed to show that he was prejudiced in any way by the omission.

ECF No. 10-21 at 49-54.

Mr. Medina has not shown how the adjudication of his post-conviction claims resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law; nor has he shown how it resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented during the post-conviction hearing.

15

### A.  Police Reports

Even assuming that counsel was deficient for failing to discover and present evidence from the four police reports, the post-conviction court reasonably concluded that Mr. Medina suffered no prejudice.

#### 1.  *Officer Slenker's August 6, 2006 report*

Mr. Medina first claims that defense counsel was ineffective for failing to discover and present Officer Slenker's report noting that a homeless man saw a black man wearing a white shirt run through the nearby woods on the day of the incident.  According to Mr. Medina, "[t]he exculpatory value of the testimony is self-evident" and it "provided a compelling basis for reasonable doubt."  ECF No. 10-1 at 16.

Upon review of the record, Mr. Medina fails to establish a reasonable probability that the result of the trial would have been different had this specific evidence been presented.  As Respondents correctly note, during closing arguments, defense counsel raised a similar theory regarding the possibility that a different individual wearing a white shirt committed the crime:

> [We] [n]ow know that the man ran from the house to the dumpster and then the tee shirt.
>
> You gotta know this, that is the tee shirt that the guilty man wore.  Why?  Think about it.  Remember the tall detective, I can't remember—Slenker.  Officer Slenker, a good guy who gets up and tell us, "That was a very peculiar thing."  Of course, it was.  You saw the well-manicured street lining.  It stuck out like a sore thumb.  White shirt laying right there in the open caused him to get suspicious, called techs to come on down and seize it and preserve it, it might have evidence, and it sure enough did.  It had the evidence.  It had the semen of the man who committed this crime.
>
> The man continued to run and got home. . . . Who knows what Franklin was doing that night.  Maybe asleep with his wife and his three kids, may be.  I'll tell you what, the evidence shows this, the man who did this got away.

July 18, 2013 Trial Transcript, ECF No. 10-15 at 23.  Defense counsel also noted that one of the women who worked at the massage center "saw a Black man running out, thought it was a customer."  *Id.* at 27.

Despite this evidence, however, the jury rejected the defense's argument that the individual in the white shirt committed the crime.  Thus, the post-conviction court was not unreasonable in concluding that the addition of Officer Slenker's report – to support the same assertion – would not have led to a different outcome.

### 2. *Det. Kuhns's August 21, 2006 report*

Next, Mr. Medina claims that counsel was ineffective for failing to discover and  introduce Det. Kuhns's report documenting M.C.'s statements that, on the night of her attack, she had "some company" who drank tea and left at 1:00 a.m. and a guest named Peter who left at 3:00 a.m.  ECF 10-1 at 16-17.  Mr. Medina asserts that this report "would have been useful in impeaching M.C.'s efforts to disclaim involvement in prostitution activities," including recent sexual activity that might explain "the tears observed during the forensic gynecological examination."  *Id.* at 17.  The court agrees with Respondents that there is no reasonable probability that, but for counsel's failure to admit the report, this impeachment evidence would have produced an acquittal.  *See* ECF No. 17 at 39.

On direct appeal, Mr. Medina challenged two rulings by the trial court that excluded proposed impeachment intended to show that M.C. was a prostitute.  *See* ECF No. 10-19 at 2.  In rejecting this challenge, the Court of Special Appeals noted that during the trial, defense counsel had been allowed to inquire whether M.C. operated a massage parlor, whether she had young women at her home who offered sex for money, and whether she was the agent or madam for these young women.  *Id.* at 12-13.  Indeed, during closing arguments, even the prosecutor acknowledged

that M.C.'s credibility had been impeached because she would not admit that the massage center was essentially a brothel. *See* ECF No. 10-15 at 1-2 (stating M.C. "wouldn't completely acknowledge that she knew what was going on" but counsel was "sure she did").

From the record, however, it does not appear that M.C. was ever able to identify the perpetrator clearly. Thus, evidence of Mr. Medina's guilt did not result from M.C.'s testimony, regardless of its truthfulness. Rather, the jury found Mr. Medina guilty presumably because of the DNA evidence identifying him as the source of saliva from the bite mark on M.C.'s cheek. Accordingly, Mr. Medina has not shown that the inclusion of Det. Kuhns's report would have resulted in a different outcome.

### 3. *Det. Kuhns's August 26, 2011 report*

In his amended petition, Mr. Medina claims that counsel was ineffective for failing to discover and introduce Det. Kuhns's report dated August 26, 2011, which "reported a negative photo identification of Mr. Medina by victim." ECF No. 10 at 9. However, in the accompanying memorandum, Mr. Medina presents no argument to support this assertion. *See* ECF No. 10-1. Thus, he fails to meet his burden of showing that counsel's performance was deficient and that the deficient performance prejudiced his defense. *See Strickland*, 466 U.S. at 687. In any event, as explained above, the jury appears to have relied on DNA evidence and not M.C.'s testimony. As such, Mr. Medina has not established a reasonable probability that, but for counsel's failure to include the report, the result of the proceedings would have been different.

### 4. *Det. Kuhns's and Det. Burrows's September 21 and 22, 2006 reports*

Next, Mr. Medina claims that counsel was ineffective for failing to discover and introduce two police reports indicating that the victim: (1) believed someone else named Joe committed the crime, and (2) suggested that her boss may kill her for cooperating with authorities. ECF No. 10-

1 at 17-18.  Medina argues that M.C.'s boss's involvement in organized crime "would have made counsel's argument that the business was a brothel more potent" and M.C.'s belief regarding "Joe" undermined the importance of her earlier description of the perpetrator.  *Id.*

The post-conviction court rejected Mr. Medina's arguments, finding that neither report contained probative information that would render counsel's performance ineffective and that Mr. Medina was not otherwise prejudiced by the omission.  ECF No. 10-21 at 53-54.  The post-conviction court's determination was not unreasonable.  As previously explained, in reaching its verdict, the jury did not seem to rely on M.C.'s identification of the perpetrator, the reliability of her testimony notwithstanding.  Therefore, the post-conviction's ruling on this issue withstands scrutiny under *Strickland*.

### B.  Hearsay

Lastly, Mr. Medina claims that the post-conviction court unreasonably concluded that Mr. Medina was not prejudiced by counsel's failure to object to a hearsay statement made by  M.C. at the hospital, but relayed to the jury by Officer Goetz, describing the sexual assault and in particular that M.C.'s pants and underwear were removed during the attack.  ECF No. 10-1 at 28.  Mr. Medina asserts that this statement was inadmissible under Maryland law and crucial to the jury's attempted rape verdict.

During the post-conviction proceeding, defense counsel testified and acknowledged that the statement at issue constituted inadmissible hearsay.  ECF No. 10-18 at 153-54.  Counsel further stated that if he were ineffective, it was "in not objecting . . . ."  *Id.*  Despite this testimony, the post-conviction court rejected Mr. Medina's claim, stating that it was "not persuaded that [counsel] was ineffective in allowing [the testimony]."  ECF No. 10-21 at 52.  The post-conviction court concluded that counsel made use of the information relayed by Officer Goetz – including

19

testimony that M.C. believed the attacker wore a white shirt – "to support his defense that someone other than the Petitioner committed the offense." *Id.*

As previously stated, representation is deficient if it falls below "an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  The standard for assessing such competence is "highly deferential," *id.* at 669, and a defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch*, 273 F.3d at 588 (quoting *Strickland*, 466 U.S. at 689). Applying § 2254(d), this court's review is limited to whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

The post-conviction court's determination was not based on an unreasonable determination of the facts in light of the evidence presented.  Mr. Medina's defense largely centered on creating reasonable doubt by emphasizing that an unknown man in a white shirt was the perpetrator.  Thus, it was reasonable for the post-conviction court to conclude that defense counsel's failure to object was tactical.

In any event, this court agrees with Respondents that Mr. Medina has failed to show prejudice.  Despite DNA evidence against Mr. Medina, as well as the fact that he was living near the crime scene when the offense was committed and that he made incriminating statements during recorded calls from the detention center, defense counsel successfully convinced the jury to acquit him of consummated rape, first-degree burglary, and robbery.  Based upon this record, the post-conviction court's ruling survives scrutiny under 28 U.S.C. § 2254(d).

There is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance.  *See Strickland*, 466 U.S. at 689.  Here, the post-conviction court noted that trial counsel's performance was not deficient, and Mr. Medina has failed to satisfy

the standard set forth in *Strickland*. Having reviewed the record in light of the deferential standard of review applicable to 28 U.S.C. § 2254 proceedings, the court concludes that the state post-conviction court's decision did not involve an unreasonable application of federal law or an unreasonable determination of the facts.

## CONCLUSION

The Petition for habeas corpus relief will be denied. When a district court dismisses a habeas petition, a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). When a district court rejects constitutional claims on the merits, a petitioner may satisfy the standard by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because Medina fails to satisfy this standard, the court declines to issue a certificate of appealability.

A separate order follows.

July 19, 2021

                                        /s/
                                        DEBORAH K. CHASANOW
                                        United States District Judge